UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* JOHN DOE,<br><br>    *Plaintiff,*<br>v.<br><br>LAHEY CLINIC HOSPITAL, INC.,<br><br>    *Defendant.* | Civil Action<br>No. _23-11684_<br><br>**FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Pursuant to the Federal False Claims Act, Plaintiff-Relator JOHN DOE

("Relator") hereby brings this action against Defendant Lahey Clinic Hospital, Inc.

("Defendant").

**INTRODUCTION**

1.    This case arises from the Defendant's repeated submission of false claims

to Medicare for reimbursement of the drug botulinum toxin Type A, commonly known

as BOTOX.

2.    Defendant operates a busy BOTOX clinic where Relator is a patient.

Relator makes the allegations concerning the Defendant through the Relator's own

first-hand experience and observation.

3.    As explained in more detail below, Defendant knowingly submitted

numerous claims—and received payment—for unused BOTOX far in excess of what

local coverage determinations permit. Relator makes this allegation based on direct

knowledge and first-hand experience: as a patient at Defendant's BOTOX clinic, Relator has on numerous occasions received treatment of 16 units of BOTOX from a single 100-unit vial of BOTOX, yet later an Explanation of Benefits ("EOB") unambiguously states that the Defendant has billed and received payment from Medicare for 184 units of BOTOX. Defendant's conduct is wrong in at least three ways—

    (i)    Defendant has billed Medicare for 184% of the cost of each 100-unit vial of BOTOX used.

    (ii)    Medicare regulations require providers to use the smallest available vial size. Defendant uses 100-unit vials of BOTOX, even though 50-unit vials are also available.

    (iii)    Medicare billing guidelines only permit billing for waste where waste is unavoidable. Even though Relator receives his medication at a clinic that regularly administers BOTOX, every EOB that Relator has received confirms that there is no effort to avoid wastage.

Put simply, Defendant repeatedly billed for 184 units where Medicare rules only entitled it to bill for 50 units.

4. Thus Defendant is routinely: (i) billing for medication that it does not provide or use; (ii) using vials that are unnecessarily large and more expensive than appropriately sized vials; and (iii) billing for drug waste that is unnecessary and avoidable. Each of these practices generates false claims.

5. As a consequence of these actions, the Government and the Relator have incurred damages in the form of excessive payments made to Defendant.

## PARTIES

6.      The Defendant Lahey Clinic Hospital, Inc., is a Massachusetts corporation. On its most recent corporate filings with the Massachusetts Secretary of the Commonwealth, it lists its principal office as 41 Mall Rd., Burlington, Massachusetts.

7.      The Relator JOHN DOE ("Relator") is a resident of Dennis, Massachusetts, and a patient at Defendant facilities. JOHN DOE is a pseudonym; his true name is known to the Government.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular the Federal False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"). In addition, the FCA specifically confers jurisdiction upon this Court pursuant to 31 U.S.C. § 3732(b).

9.      This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process, and because Defendant has sufficient minimum contacts with the United States of America.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because Defendant transacts business in this judicial district. Indeed, the principal office of Defendant is in Burlington, Massachusetts, which lies within this judicial district.

11.     Relator is unaware of any public disclosure of the information or allegations that are the basis of this Complaint. Furthermore, there is no publicly disclosed information from which the fraud described herein has been revealed or

3

could be inferred. In the event that there has been a "public disclosure" as defined by law of the actionable information or allegations that are contained in this Complaint, Relator is an "original source" as defined by law with respect to any such disclosed information or allegations. Relator has provided facts independent of and which materially add to any publicly disclosed allegations, and such facts are both "significant" and "essential" for exposing the fraud. The fact that many thousands of claims presented to Government Health Care Programs (including Medicare and Medicaid) were false/fraudulent in the manner described in this Complaint is a material fact, which if known to the United States would have caused them to deny paying those claims. Before filing this action, Relator voluntarily provided information to the United States regarding the false/fraudulent claims that are the subject of this Complaint. Relator did so on or about June 29, 2023.

## GOVERNMENT HEALTH INSURANCE PROGRAMS

12.     The Health Insurance for the Aged and Disabled Program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq. (popularly known as "Medicare"), is a health insurance program administered by the United States that is funded by taxpayer revenue. Medicare is overseen by the United States Department of Health and Human Services ("HHS") through its Centers for Medicare and Medicaid Services ("CMS").

13.     Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services, and durable medical equipment for persons over sixty five (65) years of age; and for certain others that qualify under the terms and conditions of the program, including many individuals who are permanently disabled under the Social Security Act.

14.     Reimbursement for Medicare claims is made by the United States through CMS, which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the private insurance carriers act on behalf of CMS.

15.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396v (hereafter "Medicaid"), is a health insurance program administered by the United States and the various individual states that is funded by both federal and state taxpayer revenue. The United States uses CMS to oversee Medicaid.

16.     Medicaid was designed to assist participating states in providing hospital services, medical services, durable medical equipment, and prescription drugs to, among others, financially-needy individuals that qualify for Medicaid. The states directly pay providers, with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury. *See* 42 C.F.R. §§ 430.0–430.30 (1994).

17.     The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"—now known as "TRICARE"), 10 U.S.C. §§ 1071–1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the uniformed services and to spouses and children of active duty, retired, and deceased members. The program is administered by the Department of Defense and funded by the federal government.

18.     The federal government, through its Departments of Defense and Veterans Affairs, maintains and operates medical facilities including hospitals, and receives and uses federal funds to purchase medical devices for patients treated at such facilities and otherwise.

19.     The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents. It pays for, among other items and services, medical devices for its beneficiaries. (Together, all of the programs described in Paragraphs 12–19, and any other government funded health care programs, shall be referred to as "Government Health Care Programs.")

20.     Reimbursement practices under all Government Health Care Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic requirement for reimbursement eligibility under Medicare, Medicaid, and other Government Health Care Programs is that the service provided must be reasonable and medically necessary. *See, e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396, et seq.; 42 C.F.R. § 410.50. Medical providers are not permitted to bill the government for medically unnecessary services or procedures performed solely for the profit of the provider. *See id.*

21.     Government Health Care Programs do not pay for cosmetic procedures.

22.     In other words, if a provider were to tell CMS or its agent that it had provided goods or services that were medically unnecessary, that were performed solely for the profit of the provider, and/or that violated another relevant law, then CMS would not pay the claim.

## FEDERAL FALSE CLAIMS ACT

23.     The Federal False Claims Act (the "FCA"), 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government

sustains; plus a civil monetary penalty of (i) not less than $11,181 nor more than $22,363 per claim for claims made on or before June 18, 2020; (ii) not less than $11,665 nor more than $23,331 per claim for claims made after June 18, 2020, and on or before December 13, 2021; (iii) not less than $11,803 nor more than $23,607 per claim for claims made after December 13, 2021, and on or before May 9, 2022; and (iv) not less than $12,537 nor more than $25,076 per claim for claims made after May 9, 2022.

24.     The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains; plus a civil monetary penalty of (i) not less than $11,181 nor more than $22,363 per claim for claims made on or before June 18, 2020; (ii) not less than $11,665 nor more than $23,331 per claim for claims made after June 18, 2020, and on or before December 13, 2021; (iii) not less than $11,803 nor more than $23,607 per claim for claims made after December 13, 2021, and on or before May 9, 2022; and (iv) not less than $12,537 nor more than $25,076 per claim for claims made after May 9, 2022.

25.     The FCA, 31 U.S.C. § 3729(a)(1)(C), makes any person who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the affected government party sustains and civil monetary penalties.

26.     The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the

money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. 31 U.S.C. § 3729(b)(2).

27.     The FCA, 31 U.S.C. § 3729(b)(1), provides that "(1) the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."

28.     The FCA, 31 U.S.C. § 3729(b)(4), provides that "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

## INTRODUCTION TO BOTOX

29.     BOTOX is a form of botulinum toxin, produced by strains of *Clostridium botulinum* or other related bacterium.

30.     Allergan Plc, which AbbVie, Inc., has acquired, sells BOTOX under two different brand names—BOTOX therapeutic and BOTOX Cosmetic. The underlying drugs in both varieties are identical: onabotulinumtoxinA.

31.     In the U.S. market, Allergan does not sell BOTOX therapeutic in sizes smaller than 100 Unit vials. In the same market, Allergan sells BOTOX Cosmetic in 50 Unit and 100 Unit vials.

32.     There is no valid reason why Allergan does not market and sell 50-Unit vials of BOTOX therapeutic in the United States. For years, labels for BOTOX therapeutic have stated the availability of both 50 Unit and 100 Unit vials.

33.     Even so, Allergan claims that a 50-Unit vial has "never been commercially available for therapeutic use in the U.S." Allergan makes this claim, even though the FDA approval and accompanying literature enumerate many conditions that require fewer than 50 units of BOTOX therapeutic to treat.

34.     In 2022, Allergan obtained approval of a new label that removed the 50-Unit vial as an available dose of BOTOX therapeutic. Specifically, the July 28, 2021 label—which noted the availability of BOTOX therapeutic as "50 Units, 100 Units or 200 Units vacuum-dried powder in a single-dose vial"—has given way to the August 22, 2022 label, which has dropped the 50 Unit variety: "100 Units or 200 Units vacuum-dried powder in a single-dose vial."

35.     The available labels for BOTOX Cosmetic suggest that Allergan began selling BOTOX Cosmetic in 50 Unit vials no later than sometime between 2004 and 2009. Thus at all times relevant to this action, BOTOX has been available to the Defendant in 50 Unit vials.

36.     BOTOX vials contain vacuum-dried powder that providers must reconstitute by injecting a saline solution (sterile, preservative-free 0.9% Sodium Chloride) into the vial and mixing it with the powder.

37.     The provider can then administer the reconstituted BOTOX by first entering the vial with a new, sterile needle and syringe, drawing the appropriate amount of the reconstituted BOTOX into the syringe, and then injecting the reconstituted BOTOX as dictated by the terms of the treatment.

9

38.     Per the label, the provider must administer the BOTOX within 24 hours after reconstitution and refrigerate any unused reconstituted BOTOX during that 24-hour period.

39.     Healthcare providers administer BOTOX to treat, among other things, hemifacial spasms. *See, e.g.,* Gonçalo S. Duarte et al., *Botulinum toxin type A therapy for hemifacial spasm,* Cochrane Database of Systematic Reviews, 2020, Issue 11, Art. No. CD004899, DOI: 10.1002/14651858.CD004899.pub3 (Nov. 19, 2020).

40.     Government Health Care Programs pay for the administration of BOTOX to treat hemifacial spasms.

41.     In 2021, Medicare spent $68,468,937.58 on reimbursement for BOTOX.

## BOTOX BILLING

42.     CMS provides written guidance for providers to bill for the use of BOTOX. Providers must comply with such guidance to receive payment. Much of this guidance is promulgated through Medicare Administrative Contractors (MACs).

43.     The MAC for Massachusetts that processes Medicare Part B claims is National Government Services, Inc. (NGS).

44.     In Article A52848, NGS provides specific guidance related to the billing of BOTOX under Medicare Part B:

> All services/procedures performed on the same day for the same beneficiary by the physician/provider should be billed on the same claim.
>
> **Documentation Requirements:**
>
> The patient's medical record must contain documentation that fully supports the medical necessity for services included within the

LCD. (See "Indications and Limitations of Coverage.") This
documentation includes, but is not limited to, relevant medical
history, physical examination, and results of pertinent diagnostic
tests or procedures.

For coverage of Botulinum toxin treatment by Medicare, the
medical record should include:

- documentation of the medical necessity for this treatment. For
  spastic conditions other than upper or lower limb spasticity,
  blepharospasm, hemifacial spasm, cervical dystonia or other
  focal dystonias, documentation should include a statement that
  the spastic condition has been unresponsive to conventional
  treatment;
- a covered diagnosis;
- dosage(s), site(s) and frequency(ies) of injection;
- documentation of the medical necessity for associated
  electromyography when used; and
- description of the effectiveness of this treatment.

Due to the short life span of the drug once it is reconstituted,
Medicare will reimburse the unused portions of Botulinum toxins.
When modifier –JW is used to report that a portion of the drug is
discarded, the medical record must clearly show the amount
administered and the amount discarded.

Documentation must be available upon request of the contractor.
Peer-reviewed medical literature may be requested for case-by-case
determinations.

Ctrs. Medicare & Medicaid Servs., *Billing and Coding: Botulinum Toxins*, Medicare

Coverage Database, A52848 (July 21, 2022),

https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleid=52848.

45.    CMS requires that providers bill based on the smallest vial available for

purchase from the manufacturer that provides the appropriate dose for the patient. The

use of any vial size greater than the smallest size needed is medically unnecessary.

Additionally, using any vial size greater than the smallest size needed results in wastage that is avoidable and ineligible for reimbursement. Thus, for example, it would be improper to use a 200 Unit vial of BOTOX for a patient who only needs 100 Units, as this would result in 100 Units of avoidable and unnecessary waste.

46.     The Centers for Disease Control (CDC) have also issued guidelines that require the use of the smallest vial that provides the appropriate dose:

> To prevent unnecessary waste or the temptation to use contents from single-dose or single-use vials for more than one patient, clinicians and purchasing personnel should select the smallest vial necessary for their needs when making treatment and purchasing decisions.

CDC, *Injection Safety: Protect Patients Against Preventable Harm from Improper Use of Single–Dose/Single–Use Vials* (May 2, 2012), https://www.cdc.gov/injectionsafety/cdcposition-singleusevial.html.

## TREATMENT OF RELATOR'S HEMIFACIAL SPASMS

47.     Relator is a Medicare recipient and is enrolled in a Medicare Part C plan currently administered by Blue Cross Blue Shield of Massachusetts. The plan includes Medicare Part B coverage.

48.     Relator suffers from hemifacial spasms on the left side of his face.

49.     Irregular, involuntary muscle contractions characterize hemifacial spasm.

50.     For treatment of his hemifacial spasms, Relator sees Dr. Diana Apetauerova in the Department of Neurology at the Defendant's facility in Burlington as part of the Department's "Botox Clinic."

51.     Relator's treatment consists of regular facial injections of BOTOX. These visits occur quarterly.

52.     These treatments could utilize either the therapeutic or cosmetic variety of BOTOX, and Defendant did in fact utilize *both* to treat Relator. For example, visitation notes show that the Defendant administered cosmetic BOTOX ("botulinum toxin Type A (Cosm) (BOTOX)") on September 12, 2019—

## Today's Visit

You saw Diana Apetauerova, MD on Thursday September 12, 2019. The following issue was addressed: Hemifacial spasm.

🔲 Done Today
   Lahey Scheduling Request

⚕ Medications Given
   botulinum toxin Type A (Cosm) (BOTOX) Last given at 1:03 PM

—while it administered therapeutic BOTOX ("botulinum toxin Type A (BOTOX)") on January 2, 2020—

## Today's Visit

You saw Diana Apetauerova, MD on Thursday January 2, 2020. The following issue was addressed: Hemifacial spasm.

...

⚕ Medications Given
   botulinum toxin Type A (BOTOX) Last given at 12:15 PM

53.     During these visits, Defendant repeatedly submitted claims and received payment for more BOTOX than actually administered.

54.     For example, during his May 20, 2021 appointment with Dr. Apetauerova, Relator received exactly 16 units of BOTOX, but the Defendant submitted claims for 184 units of BOTOX. In Dr. Apetauerova's progress notes, she indicated that she administered exactly 16 units of BOTOX from vial "C6547 C 4" with an expiration of "7/23," and discarded the 84 units that remained in the vial. By contrast, the payment

statement shows that Defendant submitted claims for 184 units of BOTOX:

| | NEUROLOGY PROCEDURES Visit at Department of Neurology | | |
|---|---|---|---|
| May 20 2021 | Hospital Services | Billed | $4,940.52 |
| | Provider: Diana Apetauerova, MD | Insurance Covered | -$4,717.55 |
| | Patient: ▇▇▇▇▇▇ | You Paid | -$100.00 |
| | Primary Payer: BLUE CROSS MEDICARE ADVANTAGE | Pending Insurance | $0.00 |
| | Account #1021633767 | Your Balance ● | $122.97 |

| Detailed Account Information | |
|---|---|
| **Clinic Visit** | $1,324.00 |
| Show charges ∨ | |
| **Other Diagnostic Services** | $299.00 |
| Show charges ∨ | |
| **Pharmacy** | $3,317.52 |
| HC ONABOTULINUMTOXIN A PER UNIT (0023-1145-01) - quantity: 100 - J0585 (HCPCS) | $1,803.00 |
| HC ONABOTULINUMTOXIN A PER UNIT (0023-1145-01) - quantity: 84 - J0585 (HCPCS) | $1,514.52 |
| Hide charges ∧ | |
| **Payments and Adjustments** | |
| BLUE CROSS MEDICARE ADVANTAGE | -$4,717.55 |
| SP CREDIT CARD PAYMENT - Oct 22, 2021 | -$50.00 |
| SP CREDIT CARD PAYMENT - Nov 17, 2021 | -$50.00 |

(Relator's name redacted).

55.     During his August 26, 2021 appointment with Dr. Apetauerova, Relator again received 16 units of BOTOX, but Defendant again submitted claims for 184 units of BOTOX. Dr. Apetauerova's progress notes indicate that she administered exactly 16 units of BOTOX from vial "C6759 c 4" with an expiration of "11/23," and discarded the 84 units that remained in the vial. The Defendant's payment statement again shows the submission of claims for 184 units.

56.     The Explanation of Benefits from Blue Cross Blue Shield of Massachusetts for the August 26, 2021 visit shows that the insurer paid $486.08 for 100 units of BOTOX and $408.30 for an additional 84 units of BOTOX, for a total of $894.38 paid for BOTOX:

| Claim Number/Date Received/ Provider Name/Type of Service | Date Of Service | Number of Services Used | Amount Charged | Amount Allowed | Your Co-Pay /Deductible | Your Co-Insurance | Your Benefits | Your Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | ... | | | | |
| TYPE OF SERVICE: | Injection, onabotulinumtoxina, 1 unit (J0585) 08/26/21-08/26/21 | 0100.0 | 1803.00 | 607.60 | 0.00 | 121.52 | 486.08 | 121.52 |
| TYPE OF SERVICE: | Injection, onabotulinumtoxina, 1 unit (J0585) 08/26/21-08/26/21 | 0084.0 | 1514.52 | 510.38 | 0.00 | 102.08 | 408.30 | 102.08 |

57. During his February 17, 2022 appointment with Dr. Apetauerova, Relator again received 16 units of BOTOX, but Defendant again submitted claims for 184 units of BOTOX. Dr. Apetauerova's progress notes indicate that she administered exactly 16 units of BOTOX from vial "C7006 AC 4" with an expiration of "4/24," and discarded the 84 units that remained in the vial. The Defendant's payment statement again shows submitted claims for 184 units.

58. During his May 10, 2022 appointment with Dr. Apetauerova, Relator again received 16 units of BOTOX, but Defendant again submitted claims for 184 units of BOTOX. Dr. Apetauerova's progress notes indicate that she administered exactly 16 units of BOTOX from vial "C7047 C 4" with an expiration of "5/24," and discarded the 84 units that remained in the vial. The Defendant's payment statement again shows submitted claims for 184 units.

59. During his August 25, 2022 appointment with Dr. Apetauerova, Relator again received 16 units of BOTOX, but Defendant submitted claims for 182 units of BOTOX. Dr. Apetauerova's progress notes indicate that she administered exactly 16 units of BOTOX from vial "C7130 AC 4" with an expiration of "6/24," and discarded the

15

84 units that remained in the vial. The Defendant's payment statement shows submitted claims for 182 units.

60.     During his November 17, 2022 appointment with Dr. Apetauerova, Relator received 20 units of BOTOX, but Defendant submitted claims for 180 units of BOTOX. Dr. Apetauerova's progress notes indicate that she administered exactly 16 units of BOTOX from vial "C7547 C 4" with an expiration of "2/25," and discarded the 80 units that remained in the vial. The Defendant's payment statement again shows submitted claims for 180 units.

61.     The following table summarizes these dates of visit, the quantity of BOTOX actually administered, the vial number provided in Dr. Apetauerova's progress notes, and the amount at which Defendant actually submitted claims:

| Date | Administered | Discarded | Vial Number | Units Billed | Excess Units |
|---|---|---|---|---|---|
| 2020-07-27 | 14 units | 86 units | C6324C 3 | 186 units | 136 units |
| 2020-11-05 | 14 units | 86 units | C6516C 3 | 100 units | 50 units |
| 2021-05-20 | 16 units | 84 units | C6547 C 4 | 184 units | 134 units |
| 2021-08-26 | 16 units | 84 units | C6759 c 4 | 184 units | 134 units |
| 2021-11-18 | 16 units | 84 units | C6913 c 4 | 100 units | 50 units |
| 2022-02-17 | 16 units | 84 units | C7006 AC 4 | 184 units | 134 units |
| 2022-05-10 | 16 units | 84 units | C7047 C 4 | 184 units | 134 units |
| 2022-08-25 | 16 units | 84 units | C7130 AC 4 | 182 units | 132 units |
| 2022-11-17 | 20 units | 80 units | C7547 C 4 | 180 units | 130 units |
| **TOTALS** | 144 units | 756 units | — | 1,484 units | 1,034 units |

62. Put simply, just across these nine visits by Relator, Defendant submitted claims and received payment for 1,484 units of BOTOX, even though it only administered 144 units and discarded 756 units.

63. The amount that Dr. Apetauerova recorded as being discarded from each vial is a function of the amount administered and the size of the vial. For example, during Relator's May 20, 2021 appointment, Dr. Apetauerova discarded 84 units of BOTOX because she started with a 100-unit vial of BOTOX and administered 16 units of BOTOX from that vial.

64. Relator asked Defendant what reason there was for not using 50 Unit vials. Michelle Drover—a registered nurse that Defendant employs—responded in writing that the "clinic only has and uses 100 units and 200 units Botox." Whether this statement by Defendant's agent constitutes an admission that the Defendant is failing to purchase and use appropriately sized vials or a false statement, the end result is the same: the Defendant submits claims for unnecessarily large vials of BOTOX.

**Defendant Filed Claims for Medically Unnecessary Amounts of BOTOX**

65. Reimbursement practices under all Government Health Care Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic requirement for reimbursement eligibility under Medicare, Medicaid and other Government Health Care Programs is that the service provided must be reasonable and medically necessary. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396, et seq.; 42 C.F.R. § 410.50. Medical providers are not permitted to bill the government for medically unnecessary services or procedures performed solely for the

profit of the provider. *See id.* Medical providers must use the smallest vial available for purchase from the manufacturer that provides the appropriate dose for the patient.

66.     Because Relator's treatment requires fewer than 50-units of BOTOX per session, it is medically unnecessary for Defendant to use 100-Unit vials of BOTOX for Relator's treatment when the manufacturer also makes 50-Unit vials of BOTOX available for purchase.

67.     For the treatment of Relator's hemifacial spasms, there is no medical reason that cosmetic BOTOX cannot be used in place of therapeutic BOTOX. The contents of both types of vials are identical.

68.     For providers such as the Defendant, who purchase both BOTOX therapeutic and BOTOX Cosmetic,[1] there is no medical reason to use therapeutic BOTOX instead of cosmetic BOTOX on any particular patient.

69.     The Defendant's statement that it only purchases 100-Unit vials (or larger) and its subsequent submission of payment claims based on that statement have resulted in repeated false claims for medically unnecessary quantities of BOTOX.

### Relator Did Not Receive the Treatment Billed

70.     On most visits, Relator received exactly 16 units of BOTOX.

71.     Relator never received more than 20 units of BOTOX during a single visit.

72.     Even so, the Defendant typically submitted payment claims for nearly 200 units of BOTOX per visit, meaning that the Defendant submitted payment claims far in excess of what Relator actually received in treatment.

---

[1] Lahey Hospital & Medical Center, Non-Surgical Cosmetic Procedures, https://www.lahey.org/lhmc/department/cosmetic-services/non-surgical-cosmetic-procedures/ (last visited June 23, 2023).

**Defendant Failed to Document the Correct Disposition of the Claimed BOTOX**

73.    CMS requires that the medical record "must clearly show the amount [of BOTOX] administered and the amount discarded."

74.    Defendant's records of Relator's treatment show an amount administered and an amount wasted, but these amounts do not match the amounts for which Defendant filed claims on most occasions.

75.    For example, for Relator's July 27, 2020 visit, Defendant filed a claim for 186 units of BOTOX, but the medical record accounts for only 100 units of BOTOX as having been administered or wasted.

76.    In failing to document (or by incorrectly documenting) the quantities of BOTOX administered or wasted, Defendant has violated CMS billing requirements and submitted false claims.

**Defendant's Conduct Goes Beyond Just Relator**

77.    Defendant's false claims are not limited to just Relator's treatment but extends to all of Defendant's Government Health Care Programs patients.

**LEGAL CLAIMS FOR RELIEF**

78.    Relator alleges that Defendant's conduct detailed above violates the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* (Count I). He brings these claims on behalf of the United States, as well as on his own behalf.

## CLAIM ON BEHALF OF THE UNITED STATES

### COUNT I
Federal False Claims Act
31 U.S.C. § 3729, *et seq.*

79.     Relator repeats and realleges the allegations set forth in Paragraphs 1 through 78 as if set forth fully herein.

80.     This is a claim for treble damages and penalties against Defendant under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

81.     As described in detail above, Defendant has caused the presentation of numerous false claims to the United States through the Medicare and Medicaid programs and other federal Government Health Care Programs for reimbursement of medical claims that were tainted by Defendant's unlawful conduct, which included, among other things: (i) submitting claims for medically unnecessary amounts of BOTOX, (ii) failing to provide treatment corresponding to the amounts of BOTOX billed, (iii) failing to either discard or administer the amounts of BOTOX billed, and (iv) failing to document the administration or discard of the BOTOX billed.

82.     By virtue of this conduct, Defendant knowingly made, used, or caused to be made or used, false records or statements to induce the United States to pay or approve false or fraudulent claims, and/or that were material to such false or fraudulent claims, in violation of federal law.

83.     The United States—unaware of the falsity of the records, statements, and claims (i) made, used, or presented, or (ii) caused to be made, used, or presented, by Defendant—paid and continues to pay claims that would not be paid but for Defendant's conduct as alleged herein.

84.     By reason of Defendant's conduct, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

85.     Pursuant to federal law, the United States is entitled to three times the amount of actual damages; plus the maximum civil penalty of $22,363 for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant on or before June 18, 2020; plus the maximum civil penalty of $23,331 for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant after June 18, 2020 and on or before December 13, 2021; plus the maximum civil penalty of $23,607 for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant after December 13, 2021, and on or before May 9, 2022; plus the maximum civil penalty of $25,076 for each and every false or fraudulent claim, record, or statement (i) that was made, used, or presented, or (ii) that was caused to be made, used, or presented, by Defendant after May 9, 2022.

86.     In addition, Relator is entitled to his costs of suit and attorneys' fees incurred in bringing this action. And, as provided by federal law, Relator is entitled to a "relator's share" of any recovery obtained by the United States as a result of this claim.

## CONCLUSION

WHEREFORE, Plaintiff-Relator JOHN DOE, on behalf of the United States and himself, prays that this Court:

1.      Enter judgment against Defendant holding it liable for three times the
        amount of damages sustained by the United States because of Defendant's
        conduct;

2.      Enter judgment against Defendant holding them liable for a civil penalty
        of (i) $22,363 for each violation of the Federal False Claims Act committed
        by Defendant on or before June 18, 2020; (ii) $23,331 for each violation of
        the Federal False Claims Act committed by Defendant after June 18, 2020
        and on or before December 13, 2021; (iii) $23,607 for each violation of the
        Federal False Claims Act committed by Defendant after December 13,
        2021, and on or before May 9, 2022; and (iv) $25,076 for each violation of
        the Federal False Claims Act committed by Defendant after May 9, 2022.

3.      Enter judgment against Defendant awarding Relator a percentage of the
        proceeds recovered by the United States as a result of this action in
        accordance with 31 U.S.C. § 3730(d);

4.      Enter judgment against Defendant awarding Relator his costs of suit and
        attorneys' fees for prosecuting this action in accordance with 31 U.S.C. §
        3730(d);

5.      Enter judgment against Defendant awarding the United States and/or
        Relator any and all other relief that the Court finds to be just and
        equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff-Relator JOHN DOE demands trial by jury on all counts in this action.

Respectfully submitted,
JOHN DOE
By his attorneys

Ilyas J. Rona (BBO #642964)
ijr@mrdklaw.com

Date: 7/27/2023

Jin Ho King (BBO #679528)
jhk@mrdklaw.com
MILLIGAN RONA DURAN & KING LLC
28 State Street, Suite 802
Boston, MA 02109
Tel: 617-395-9570

Royston H. Delaney, Esq. (BBO#655666)
Rory Delaney, Esq., LLC
28 State Street, Suite 802
Boston, Massachusetts 02109
Tel: (857) 498-0384
royston@delaneykester.com